## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

MSP Aviation, LLC,                            BKY Case No. 14-41184-MER

                          Debtor.             Chapter 7

Randall L. Seaver, Trustee,                   ADV No. 14-04175-MER

                          Plaintiff,

        -v.-

Joanne Katherine Ashenfelter,                 FINDINGS OF FACT,
                                              CONCLUSIONS OF LAW,
                          Defendant.          AND ORDER OF DISMISSAL
                                              WITH PREJUDICE
_____

At Minneapolis, Minnesota, June 5, 2015.

This adversary proceeding came on for trial before the Court.  Matthew D. Swanson

appeared on behalf of the Plaintiff, Randall L. Seaver, Trustee ("Trustee").  Thomas J. Flynn and

Richard J. Reding appeared on behalf of the Defendant, Joanne Ashenfelter.  At the conclusion

of the trial, the Court requested that the parties submit proposed findings of fact and conclusions

of law.  Both parties did so and the Court took the matter under advisement.  The matter is now

ready for disposition.

This Court has jurisdiction under 28 U.S.C. §§ 157(a) and 1334.  The Trustee's claims

arise under 28 U.S.C. § 2201, 11 U.S.C. § 105(a), and Minn. Stat. § 322B.54.  This is a core

proceeding under 28 U.S.C. § 157(b)(2)(K).  Based on all the files, records and proceedings

herein, together with the testimony of witnesses and exhibits received at trial, as well as the

1

arguments of counsel, the Court makes the following:

### FINDINGS OF FACT[1]

1.      The Debtor, MSP Aviation, LLC ("MSP Aviation" or "Debtor") is a Minnesota

limited liability company organized on March 17, 2011.  The Debtor was in the business of

providing repair and other services to corporate jets at the Minneapolis-St. Paul International

Airport.

2.      At formation, the Defendant, Joanne Ashenfelter, was the part-owner of MSP

Aviation, but later became the sole owner.

3.      Timothy Ashenfelter is the Defendant's husband and was responsible for MSP

Aviation's day-to-day operations.

**A.      MSP Aviation's Formation and Capitalization**

4.      MSP Aviation founding members were Joanne Ashenfelter and Jeffrey Balagna.

(Trustee Ex. W).

5.      Joanne Ashenfelter provided an initial $500.00 capital contribution for her 50%

membership in MSP Aviation. (Trustee Ex. W, Contribution Agreement, Schedule 1).

6.      MSP Jet Center, LLC ("MSP Jet Center"), was MSP Aviation's corporate

predecessor and was owned in part by Timothy Ashenfelter, Joanne Ashenfelter's husband, and

in other part by Jeffrey Balagna.  On March 31, 2011, MSP Aviation acquired all of MSP Jet

Center's operating assets, including equipment and accounts receivable, along with all of its

---

[1] On February 3, 2015, the parties filed a stipulation of undisputed facts.  ECF No. 20.
The facts identified in the parties' stipulation are hereby incorporated into the Court's own
findings of fact.  At trial, the parties also stipulated to the admission into evidence of all exhibits
submitted by both parties in this dispute.  Finally, non-party witnesses were sequestered at trial,
at the Trustee's request, under Fed. R. Evid. 615.

debts. (Trustee Ex. A).  Stated another way, the consideration for the purchase of the assets of MSP Jet Center was the Debtor's assumption of the seller's debt and contract obligations.  Id.

7.    At the time of the asset purchase, MSP Jet Center's debts included approximately $400,000.00 owed to Signature Bank; this debt was personally guaranteed by Timothy Ashenfelter and Jeffrey Balagna.  Id.  Signature Bank's loan was secured by a first-position lien on all of MSP Aviation's assets.  (Ashenfelter Ex. 7).

8.    Timothy Ashenfelter credibly testified that at the time of the transfer between MSP Jet Center and MSP Aviation, the new entity had sufficient capital to successfully operate. Mr. Joel Carlson also testified that MSP Aviation was sufficiently capitalized to operate successfully.

9.    The testimony of Mr. Ashenfelter and Mr. Carlson is consistent with the record in this case.  Specifically, MSP Aviation's 2011 unfiled partnership return shows MSP Aviation had gross income of $600,477.00 and $3,309.00 of net income after deductions and depreciation. (Trustee Ex. I).  Signature Bank's internal notes regarding MSP Aviation, dated August 31, 2011, show that the company was profitable.  Signature Bank's notes stated that MSP Aviation had "profitability and strong cash flow" in fiscal year 2011.  (Trustee Ex. D, p. 6).  Additionally, Mr. Ashenfelter and Mr. Carlson both testified that the assets conveyed from MSP Jet Center to MSP Aviation were sufficient for MSP Aviation to generate revenue and to operate as a viable business.

10.    Based upon the evidence before it, the Court finds that MSP Aviation was adequately capitalized at its formation.  Moreover, the Trustee failed to introduce any rebuttal witnesses or expert testimony that contradicted this finding.

**B.      Jeffrey Balagna Removed Himself as Shareholder**

11.      In May 2011, Jeffrey Balagna left MSP Aviation.  He requested that MSP Aviation release him from his personal guaranty of the Signature Bank debt.

12.      Through a document dated May 27, 2011, and entitled "stock redemption agreement," Jeffrey Balagna agreed to transfer his membership interest in the Debtor back to the company, thereby making Joanne Ashenfelter the sole owner of the Debtor.  (Trustee Ex. B).  A pre-condition to the transfer of Mr. Balagna's interest was that Signature Bank release him from his personal guaranty.  Id.

13.      Timothy Ashenfelter testified at trial that, as a requirement for the assignment and assumption of the Signature Bank debt and release of Mr. Balagna from his personal guaranty, Signature Bank required the Debtor to reduce its obligation to Signature Bank through a pay down of $200,000.00.  (Ashenfelter Ex. 7).

**C.      The July 15, 2011 Loan Transaction**

14.      On July 15, 2011, Joanne Ashenfelter entered into the transaction at issue in this litigation.  The purpose of the transaction was for Joanne Ashenfelter to loan $200,000.00 to MSP Aviation with an option for a loan of up to another $100,000.00, for a total of $300,000.00, as MSP Aviation's needs required.

15.      Five documents were introduced at trial that memorialized the terms of the loan transaction, as follows:

      i.      A Loan Agreement between MSP Aviation, LLC and Joanne Ashenfelter dated July 15, 2011.  (Ashenfelter Ex. 1).  This document stated that Joanne Ashenfelter would provide MSP Aviation with advances up to

4

$300,000.00.

ii.    A Secured Demand Promissory Note between MSP Aviation, LLC and

Joanne Ashenfelter, dated July 15, 2011; the Debtor executed and

delivered the secured promissory note, in the maximum amount of

$300,000.00, to Joanne Ashenfelter.  (Ashenfelter Ex. 2).  This document

stated that the rate of interest on the loan would be 5% per annum and

payment would be due upon Joanne Ashenfelter's demand.  Id.

iii.    A Resolution Authorizing Borrowing of Money from a Director, Officer

and Shareholder, and Issuance of Security Promissory Note and Related

documents, dated July 15, 2011, which the Debtor approved.

(Ashenfelter Ex. 3).   The resolution authorized the company to borrow up

to $300,000.00 from Joanne Ashenfelter.  Id.

iv.    A Security Agreement, dated July 15, 2011, which provided that Joanne

Ashenfelter was to have a blanket lien over all of Debtor's assets, tangible

and intangible.  (Ashenfelter Ex. 4).  Specifically, the Security Agreement

states that Joanne Ashenfelter was granted a lien in all inventory of the

Debtor, all equipment of the Debtor, all accounts and other rights to

payment, all general intangibles, and other assets of the Debtor as

described in the Security Agreement.  Id.

v.    A UCC-1 Financing Statement, with an Addendum, which was filed with

the Office of the Minnesota Secretary of State on July 19, 2011, document

number 201124995268.  (Ashenfelter Ex. 5).  The UCC-1 related to the

security interest granted by the Security Agreement.

16.     At trial, Joanne Ashenfelter testified that she had not read the loan documents in detail, but had looked them over, and that Timothy Ashenfelter had explained them to her, adding, rather convincingly, that she trusted her husband.  She also testified at trial that it was her understanding that she was providing a loan–as opposed to an equity investment–to MSP Aviation.  Indeed, Joanne Ashenfelter credibly testified that the loan was "never intended to not be repaid."  Joanne Ashenfelter's understanding of the transaction is consistent with the documents entered into evidence at trial.

17.     Timothy Ashenfelter also testified that the intent of the transaction was for MSP Aviation to obtain a loan from Joanne Ashenfelter. Timothy Ashenfelter's testimony is also consistent with the documents entered into evidence at trial and when taken in context.

18.     On July 15, 2011, Joanne Ashenfelter wired $200,000.00 from her personal account to Signature Bank.  (Ashenfelter Ex. 8).  As a result of this payment, the bank released Mr. Balagna from his guaranty per the May 27, 2011 stock redemption agreement and Joanne Ashenfelter became the sole owner of MSP Aviation.  (Trustee Ex. B and Ashenfelter Ex. 7).

19.     MSP Aviation assumed the Signature Bank debt of MSP Jet Center through the July 15, 2011 agreement with Signature Bank.  (Ashenfelter Ex. 7).

20.     On September 4, 2012, Joanne Ashenfelter provided another $25,000.00 to MSP Aviation.  (Ashenfelter Ex. 9).

**D.     Additional Transactions Related to the Loan**

21.     On September 25, 2012, Timothy Ashenfelter entered into a purchase agreement with a third party buyer for the sale of a 1972 Ferrari F-Car for $106,500.00.  (Ashenfelter Ex.

6

12).

22.    Timothy Ashenfelter testified that it was his belief at that time that he had

transferred the title of the car to Joanne Ashenfelter a couple of years earlier.  Mr. Ashenfelter

admitted at trial, however, that this earlier understanding had been incorrect, and that the car had

been titled in his name.  Mr. Ashenfelter also testified that it was his intention that even if title to

the car had not been transferred, that he had "always intended for her to have the car," and that it

was his intention that the proceeds of the car be given to Joanne Ashenfelter.  Joanne Ashenfelter

also credibly testified that Mr. Ashenfelter had "given" the car to her.

23.    Of the proceeds generated from the sale of the F-Car, $75,000.00 was wired by

the buyer directly to Signature Bank; Timothy Ashenfelter testified that this amount was credited

as part of Joanne Ashenfelter's Loan Agreement with the Debtor.

**E.    The Debtor's Financial Statements and the Signature Bank Subordination**

24.    Timothy Ashenfelter credibly testified that, at some point in 2011, the initial

$200,000.00 "contribution" from Joanne Ashenfelter was listed on the Debtor's internal financial

statements[2] as a loan, but was later changed to identify the $200,000.00 as a capital

contribution–intimating an intention to appease Signature Bank, i.e., "because of the stupid

Bank."  (Trustee Ex. K).  When taken in full context, Timothy Ashenfelter's testimony is

consistent with the documents entered into evidence at trial.

25.    MSP Aviation's balance sheets recorded Joanne Ashenfelter's contribution as a

loan:

      i.    On a balance sheet dated August 31, 2011, Joanne Ashenfelter's

---

[2] These were internal financials created by the internal, company accountant.

contribution is listed as "Secured Note – JKA." (Trustee Ex. C).

    ii.    The same entry appears on a balance sheet dated September 30, 2011. Id.

    iii.    MSP Aviation's December 31, 2011 balance sheets likewise show the

          entry for "Secured Note – JKA." Id.

26.    It is clear from the evidence that Signature Bank viewed the money given to the

company by Mrs. Ashenfelter as a loan. On October 17, 2011, Tony M. Ferraro, the vice-

president of Signature Bank, sent an email to Timothy Ashenfelter concerning the loan from

Joanne Ashenfelter. In that email, Mr. Ferraro wrote:

> One question I have is on the financials there is a $200k note listed
> to your wife I believe and it says secured note? What is that and
> what is it secured with? It was my understanding that money was
> put into the company as capital. If it is note it needs to be
> subordinated to the bank's 1st position on business assets.

(Trustee Ex. F).

27.    That same day, Timothy Ashenfelter wrote back to Mr. Ferraro, stating:

> When Joanne put this money in the only way we could secure it
> was by making a note to the company. This was suggested by our
> attorney. . . . We can sign a subordination agreement that puts the
> bank in first place, no problem.

Id.

28.    After a related email exchange between Mr. Ashenfelter and Mr. Ferraro on

October 25, 2011, Id., Joanne Ashenfelter, on November 1, 2011, executed a Subordination

Agreement with Signature Bank. (Ashenfelter Ex. 13). If the loan had been a capital

contribution, a subordination agreement would have been unnecessary. One of the terms of the

Subordination Agreement was that MSP Aviation could not make payments to Joanne

Ashenfelter without first paying the debts it owed to Signature Bank. Id.

29.     The evidence produced at trial in the form of the early balance sheets and in the email between Mr. Ferraro and Timothy Ashenfelter demonstrate that the agreement between MSP Aviation and Joanne Ashenfelter was a loan; indeed, it was represented as such to Signature Bank.

### F.    Joel Carlson Becomes MSP Aviation's Accountant

30.     At some point in March 2012, Joel Carlson, a certified public accountant, became the outside accountant for MSP Aviation.  Mr. Carlson helped prepare interim balance sheets, as well as corporate tax returns for the years 2011 through 2013.

31.     In their Stipulation of Undisputed Facts, the parties stipulated to the following:

   i.      Internal financial statements, as well as statements produced to Signature Bank, created on the Debtor's behalf, recorded the transfers from Joanne Ashenfelter as capital contributions.  (Trustee Exs. C and K).

   ii.     Unfiled 2011 Federal and State Income tax returns created on the Debtor's behalf disclose no loans from partners.  The 2011 returns identify Joanne Ashenfelter's contributions to the Debtor, or payments made on behalf of the Debtor, as capital contributions.  (Trustee Ex. I).

   iii.    Filed 2012 Federal and State Income tax returns created on the Debtor's behalf disclose no loans from partners; the 2012 returns identify Joanne Ashenfelter's contributions to the Debtor, or payments made on behalf of the Debtor, as capital contributions.  (Trustee Ex. J).

   iv.     Joanne Ashenfelter filed personal tax returns in 2011 and 2012 utilizing the K-1 forms produced from the Debtor's returns indicating that her

contributions to the Debtor were capital contributions.  (Trustee Exs. M and V).

32.    Mr. Carlson testified that it was his belief that because the loan from Joanne Ashenfelter had been subordinated to the Signature Bank indebtedness, the loan should be reflected as equity on MSP Aviation's balance sheets.  Mr. Carlson placed the loan in the equity section, but failed to break out the loan.  Mr. Carlson testified that this description had been a mistake.

33.    Mr. Carlson further testified that he had not seen the loan documentation between MSP Aviation and Joanne Ashenfelter until after the Trustee commenced this action.  Mr. Carlson further testified that, had he seen those documents, or had he been asked to produce audited financial statements, he would not have treated the loan as equity.

34.    However, Mr. Carlson testified that Timothy Ashenfelter had consistently described the transaction to him as being a loan.

35.    Mr. Carlson credibly testified that he believed that it was immaterial whether Joanne Ashenfelter's contributions to MSP Aviation were described as a loan or as equity in the tax returns.  Mr. Carlson testified that, for purposes of federal taxation, a taxpayer's basis in a business entity would be the same regardless of whether a contribution was regarded as a loan or was treated as equity; the characterization had no effect on the tax liability.  Mr. Carlson credibly testified that Joanne Ashenfelter received no benefit from the way her interests were described in her personal tax returns.

36.    Mr. Carlson also testified that other than MSP Aviation, only Signature Bank was given the interim balance sheets that reflected Joanne Ashenfelter's secured loan.  Mr. Carlson

10

credibly testified at trial that it was his understanding that Signature Bank was aware of the loan

and that it was Mr. Carlson's understanding that Signature Bank would treat the subordinated

debt as equity for the bank's own internal calculations, whether or not it was reported as a loan

or as an equity contribution.  Later, sometime after June 6, 2014, Mr. Carlson changed the

interim financial statements back to referring to the loan as a loan on the financial statements.

(Trustee Exs. K and O, p. 36.).

37.     Mr. Carlson's testimony is consistent with the content of the October 17, 2011

email exchange between Timothy Ashenfelter and Tony Ferraro. The execution of the

Subordination Agreement between Joanne Ashenfelter and Signature Bank, in which the bank

acknowledged the loan, and required the Subordination Agreement, also bears this out.  Indeed,

Mr. Ashenfelter credibly testified that the Debtor was prohibited from making any payments to

Joanne Ashenfelter until the bank was paid in full.

### G.     MSP Aviation's Assets are Sold to Signature Flight Support

38.     On May 21, 2013, the Debtor entered into a transaction with Signature Flight

Support Corporation in which the Debtor sold nearly all of its business operations and assets.

(Ashenfelter Ex. 6).  From the proceeds of that sale, the Signature Bank loan was paid in full and

Joanne Ashenfelter received a payment of $144,439.28.  Id.

39.     On May 30, 2013, an Amendment to the UCC Financing Statement relating to the

Security Agreement was filed with the Minnesota Department of State (Filing No.

20133254513).   (Ashenfelter Ex. 6 at 000046).  The Amendment released Joanne Ashenfelter's

interest in the assets sold to Signature Flight Support.

40.     The Metropolitan Airports Commission ("MAC") had a claim against MSP

Aviation for unpaid amounts owed under an "Airside Services Agreement."  (Ashenfelter Ex. 6).

At the time of the May 2013 sale, the MAC's claim against MSP Aviation was both disputed and

unliquidated.  See BKY Case No. 14-41184 ECF No. 1 (Schedule F).

41.     MSP Aviation and Signature Flight Support agreed to an Asset Purchase

Agreement, which memorialized the terms of the asset sale.  (Ashenfelter Ex. 6).  Part of the

Asset Purchase Agreement involved the escrow of funds related to the MAC's claim.  In that

agreement, $70,000.00 of the proceeds from the sale of the assets was to be put into an escrow

account to facilitate a settlement of the dispute between MSP Aviation and the MAC:

> [Signature Flight Support] and [MSP Aviation] agree that $70,000 (the "Escrow
> Amount") of the Purchase Price shall be deposited into a trust account (the "Escrow
> Account") of Freeborn & Peters LLP, [Signature Flight Support]'s legal counsel, who
> shall cause the Escrow Amount to be held in such account until it has received joint
> written instructions from [Signature Flight Support] and [MSP Aviation] regarding its
> distribution and payment. [Signature Flight Support] and [MSP Aviation] acknowledge
> that they intend to supply such written instructions upon the final resolution of current
> disagreement between [MSP Aviation] and the Metro Airport Commission ("MAC")
> relating to the amount of concession fees owed by [MSP Aviation] to MAC; provided
> that in the event such dispute has not been settled in writing by [MSP Aviation] and
> MAC on or before December 31, 2013, the Escrow Amount shall be released to [MSP
> Aviation] and [MSP Aviation]'s option. [Signature Flight Support] and [MSP Aviation]
> acknowledge that the Escrow Account will be a non-interest bearing bank account with
> The Northern Trust, Chicago, Illinois.

(Ashenfelter Ex. 6, Asset Purchase Agreement at § 3(b)(i)).

42.     The MAC sued MSP Aviation in Hennepin County District Court seeking

payment of its claims for the unpaid concession fees.  During the course of that litigation, MSP

Aviation was unable to resolve the MAC claims prior to December 31, 2013, and the escrowed

funds were placed in the custody of the Hennepin County District Court pending resolution of

the dispute.  (Trustee Ex. S).

43.     MSP Aviation filed a voluntary chapter 7 petition on March 21, 2014.

12

44.     After MSP Aviation filed bankruptcy, the escrowed funds were placed in the Trustee's custody.  (Trustee Ex. T).  The escrowed funds have remained in the Trustee's custody pending resolution of this matter.  (Trustee Ex. U).

45.     In light of the foregoing, the Court finds that the transactions at issue in this adversary proceeding were loans from the Defendant; they were not equity contributions.

## CONCLUSIONS OF LAW

Via the present action,[3] the Trustee seeks the following:

1.      Declaratory relief, under 28 U.S.C. § 2201(a), that all contributions made by the Defendant to the Debtor, or on the Debtor's behalf, be deemed equity contributions and not loans;

2.      Recharacterization of the Defendant's $300,000.00 of transfers to the Debtor, or on the Debtor's behalf, as equity contributions under 11 U.S.C. § 105;[4] and

3.      Recovery of the $144,439.28 payment to the Defendant as an unauthorized transfer pursuant to Minn. Stat. § 322B.54, Subd. 1, and holding that the Defendant has no enforceable security interest in the $70,000.00 currently in the Trustee's possession.

---

[3] The Trustee's complaint contains two counts.  See ECF No. 1.

[4] As the party seeking to recharacterize the arrangement, the Trustee has "the burden of proof on the issue of recharacterization."  Daewoo Motor America, Inc. v. Daewoo Motor Co., Ltd. (In re Daewoo Motor America, Inc.), 471 B.R. 721, 732 (Bankr. C.D. Cal. 2012).  See also Vieira v. AGM II, LLC (In re Worldwide Wholesale Lumber, Inc.), 378 B.R. 120, 124 (Bankr. D. S.C. 2007) ("The party seeking to reclassify a debt as an equity contribution needs to demonstrate that the intent of the parties at the time they entered into the transaction was to enter into an investment relationship, not a lending relationship.").

13

## A.    Declaratory Relief

Section 2201(a) of Title 28 provides, in relevant part, that:

In a case of actual controversy within its jurisdiction, except with respect to
Federal taxes . . . any court of the United States, upon the filing of an appropriate
pleading, may declare the rights and other legal relations of any interested party
seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a).

A declaratory judgment is a remedy, not a cause of action.  See, e.g., Onvoy, Inc. v.

ALLETE, Inc., 736 N.W.2d 611, 617–18 (Minn. 2007) (a declaratory judgment action may be

maintained only where there is a justiciable controversy); Buck v. American Airlines, Inc., 476

F.3d 29, 33 n.3 (1st Cir. 2007) (noting that the Declaratory Judgment Act, 28 U.S.C. § 2201

"creates a remedy, not a cause of action").

The Trustee's claim for declaratory judgment must be dismissed because there is no legal

basis for affording the remedy.  The Trustee is not entitled to declaratory judgment as a remedy

since the Trustee asks the Court to make a factual determination that the money Joanne

Ashenfelter gave to MSP Aviation was equity rather than a loan.  But, the Court has found to the

contrary.  And in light of the Court's conclusions, see *infra*, that the Trustee's substantive claims

must be dismissed, "[the Trustee is] left with a remedy in search of [a] right."  Scanlon v.

Northwest Mortg., Inc., Civ. No. 11–3128 (MJD/TNL), 2012 WL 2885131, *7 (D. Minn. July

13, 2012); see also Lara v. Federal Nat. Mortg. Ass'n, Civ. No. 13–676 (SRN/AJB), 2013 WL

3088728 at *3 (D. Minn. June 18, 2013) (finding that where plaintiff had failed to state a

substantive claim, the amended complaint also failed to state a claim for declaratory judgment)

(citing Weavewood, Inc. v. S & P Home Invs., LLC, 821 N.W.2d 576, [579] (Minn. 2012) ("A

declaratory judgment is a procedural device through which a party's existing legal rights may be

14

vindicated so long as a justiciable controversy exists.")).

Therefore, Count One of the Trustee's complaint must be dismissed.

### B.    Equitable Recharacterization

Count Two of the Trustee's complaint asks the Court, under a theory of equitable recharacterization, to recharacterize Joanne Ashenfelter's contributions as equity rather than a loan.  The Trustee seeks this determination under the Court's general equitable powers contained in 11 U.S.C. § 105(a).

At the outset, the Court must determine whether it has the ability to grant equitable recharacterization under the facts of this case.  Equitable recharacterization is not a remedy found in the Bankruptcy Code.  Recently, the United States Supreme Court reaffirmed its long-standing holding that "'whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of ' the Bankruptcy Code."  Law v. Siegel, 134 S Ct. 1188, 1194 (2014) (quoting Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206 (1988), and citing Raleigh v. Illinois Dept. of Revenue, 530 U.S. 15, 24–25 (2000); United States v. Noland, 517 U.S. 535, 543 (1996); SEC v. United States Realty & Improvement Co., 310 U.S. 434, 455 (1940)).

While the Supreme Court has recognized that "[t]he equity powers of the bankruptcy court play an important part in the administration of bankrupt estates in countless situations in which the judge is required to deal with particular, individualized problems," Butner v. U.S., 440 U.S. 48, 55–56 (1979), "[f]rom the fundamental principles embraced by the *Butner* opinion, however, as well as from the language of § 105(a) itself, it follows that, absent a specific grant of authority from Congress or exceptional circumstances, a bankruptcy court may not exercise its

equitable powers to create substantive rights which do not exist under state law." Johnson v.

First Nat. Bank of Montevideo, 719 F.2d 270, 274 (8th Cir. 1983). Stated another way, a

bankruptcy court's equitable powers under § 105(a) are not a license to create new remedies that

would be at odds with other provisions of the Bankruptcy Code or other congressional grant.

Thus, § 105(a) does not permit a bankruptcy court to recognize substantive rights that do not

exist under non-bankruptcy law. In the end, the Supreme Court's closing remarks in Law v.

Siegel that "whatever other sanctions a bankruptcy court may impose on a dishonest debtor, it

may not contravene express provisions of the Bankruptcy Code," 134 S. Ct. at 1198, highlight

the caution that a bankruptcy court must exercise in utilizing § 105(a).

The Eighth Circuit has not ruled on whether § 105(a) permits a bankruptcy court to

equitably recharacterize a loan to equity. But in Duke & King Mo., LLC v. Nath Cos., (In

re Duke & King Acquisition Corp.), 508 B.R. 107 (Bankr. D. Minn. 2014), Chief Judge Kishel

granted a Fed. R. Civ. P. 12(b)(6) motion against a claim of equitable recharacterization.

The Court concludes that the facts of this case do not support a theory of equitable

recharacterization.[5] Here, the Trustee needed to demonstrate that Joanne Ashenfelter's

contributions to MSP Aviation were equity rather than a loan—from the first instance. The

record, however, demonstrates that Joanne Ashenfelter's 2011 transaction was intended to be a

---

[5] It is worth noting that the Trustee's complaint does not, for example, ask the Court to
equitably subordinate the claim to that of other creditors, which is a remedy found in the Code
and which would not be at odds with Bankruptcy Code. See 11 U.S.C. § 510(c). Cf. Law v.
Siegel, 134 S. Ct. at 1194 ("'whatever equitable powers remain in the bankruptcy courts must
and can only be exercised within the confines of ' the Bankruptcy Code.") (citations omitted).
Where there is a specific provision of the Code that allows similar relief, the Court is not
empowered to go beyond those provisions. See, e.g., Johnson v. First National Bank of
Montevideo, 719 F.2d at 273 (stating that "although a bankruptcy court is essentially a court of
equity, its broad equitable powers may only be exercised in a manner which is consistent with
the provisions of the Code." (citations omitted)).

loan from inception, i.e., at the time the loan was given.  Even were the Court to adopt one of the

competing theories for equitable recharacterization utilized by various courts across the country,[6]

which the Court does not need to decide today, the Court would nevertheless conclude that

equitable recharacterization is inappropriate under these circumstances.

The tests for equitable recharacterization examine whether the transaction at issue

was a loan or equity from the start.  See, e.g., FCC v. Airadigm Communs., Inc. (In re

Airadigm Communs., Inc.), 616 F.3d 642, 658 (7th Cir. 2010) (equitable recharacterization

determines what the transaction was "in the first instance").

Of those circuits that have adopted equitable recharacterization, a variety of multi-factor

tests have emerged.  The most widely applied analysis by those circuits that have permitted

equitable recharacterization is that of Roth Steel Tube Co. v. Commissioner of Internal

Revenue, 800 F.2d 625, 630 (6th Cir. 1986), cert. denied, 481 U.S. 1014, 107 S. Ct. 1888 (1987).

The factors noted in Roth Steel are:  (1) the names given to the instruments, if any, evidencing

the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments;

(3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of

repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between

the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's

ability to obtain financing from outside lending institutions; (9) the extent to which the advances

were subordinated to the claims of outside creditors; (10) the extent to which the advances were

used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide

repayments.  Id.  No single factor is controlling or decisive.  Id.

---

[6] See Duke & King, 508 B.R. at 156–57 (describing the various tests).

17

The Court concludes that if it were to determine that it had the power to equitably recharacterize a loan to capital, it would decline to do so in light of the facts adduced at trial and the factors in <u>Roth Steel</u>, to which the Court now turns.

The first <u>Roth Steel</u> factor considers the names given to the instruments evidencing the indebtedness.  With respect to the transaction at issue in this case, the instruments support a conclusion that Joanne Ashenfelter's transaction with the Debtor was a loan.  Each of the five documents at issue is unambiguous in describing the transaction as a loan, and clearly demonstrates that the transaction is structured as a loan—indeed, a secured loan.  Clearly, this factor weighs in favor of the Defendant.

The second factor involves the presence or absence of a fixed maturity date and schedule of payments.  The Secured Demand Promissory Note (Ashenfelter Ex. 2), does not contain either a fixed maturity date or a schedule of payments.  However, this is not dispositive.  As the Sixth Circuit has put it, a "rigid application of a rule that the lack of a fixed maturity date and fixed repayment schedule was indicative of equity would create a *per se* rule that use of a demand note by an insider would always be indicative of an equity contribution rather than a loan."  <u>Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.)</u>, 269 F.3d 726, 750 (6th Cir. 2001) (quotation omitted).  Thus, this factor is neutral.

The third factor is the presence or absence of a fixed rate of interest and interest payments.  The Secured Demand Promissory Note provides for a rate of interest at 5% per annum.  (Ashenfelter Ex. 2).  It is undisputed that Joanne Ashenfelter did not receive interest payments on the loan.  However, "the deferral of interest payments does not by itself mean that the parties converted a debt transaction to equity since the defendants still expected to be

18

repaid." Id. at 751.  Joanne Ashenfelter consistently testified that she expected to be repaid, and the Trustee produced no evidence indicating an intention to the contrary.  This testimony was also supported by the testimony of Mr. Ashenfelter.  Moreover, the evidence at trial demonstrated that one of the terms of the Subordination Agreement with Signature Bank was that Joanne Ashenfelter could not receive interest payments on her subordinated debt.  (Ashenfelter Ex. 13).  The Court concludes that this factor weighs in favor of the Defendant.

The fourth factor is the source of repayments.  Where repayment depends solely on the success of the borrower's business, the transaction may be construed to be more akin to a capital contribution.  Roth Steel, 800 F.3d at 631.  However, when the creditor has secured the transaction with a lien, courts will generally find in favor of a loan.  Autostyle Plastics, 269 F.3d at 751.  Here, the loan was clearly secured.  The Court concludes that, given the secured character of the loan, this factor weighs in favor of the Defendant.

The fifth factor considers the adequacy or inadequacy of capital.  The Trustee alleged that MSP Aviation was not adequately capitalized.  Joanne Ashenfelter, Timothy Ashenfelter, and Joel Carlson each credibly testified that the company had substantial capital.  Moreover, the evidence concerning MSP Aviation's capitalization came from Signature Bank.  In August 2011, shortly after the transaction at issue, Signature Bank indicated that MSP Aviation had "profitability and strong cash flow" in fiscal year 2011.  (Trustee Ex. D, at p. 6).  Because the only evidence adduced at trial supports Joanne Ashenfelter's contention that MSP Aviation was adequately capitalized, the Court concludes that this factor weighs in favor of the Defendant.

The sixth factor is the identity of interest between the creditor and the stockholder.  The creditor and the shareholder in this case are the same:  Joanne Ashenfelter.  While this factor

19

weighs in favor of the Trustee, it is not dispositive.

The seventh factor is the security for the advances.  The presence of security is a strong indication that the advances were loans.  Roth Steel, 800 F.2d at 631.  Here, the transaction at issue was accompanied by a security agreement providing for a blanket lien over all of MSP Aviation's assets.  (Ashenfelter Ex. 4).  Accordingly, this factor weighs in favor of the Defendant.

The eighth factor is the inability of the borrower to obtain outside financing.  In dealing with a small, closely held company, it is often true that the only source of funding will be from insiders.  As the Fourth Circuit put it, "[i]n many cases, an insider will be the only party willing to make a loan to a struggling business, and recharacterization should not be used to discourage good faith loans."  Fairchild Dornier GmBH v. Official Cm'te of Unsecured Creditors (In re Dornier Aviation (N. Am.) Inc.), 543 F.3d 225, 234 (4th Cir. 2006).  Nothing in this case indicates that Joanne Ashenfelter's actions in providing a loan to the company were nefarious.  While the Trustee asserts that this factor weighs heavily in favor of his position, the Court concludes that this factor is at best neutral.

The ninth factor is the extent to which the advances were subordinated to the claims of outside creditors.  "Subordination of advances to claims of all other creditors indicates that the advances were capital contributions and not loans."  Roth Steel, 800 F.2d at 631–32 (emphasis added).  Here, in contrast, Joanne Ashenfelter's advances were subordinated only to Signature Bank's claims, a subordination that was unnecessary, as Signature Bank had a first position priority lien already.  Given the subordination agreement with Signature Bank, this factor solidly weighs in favor of the Defendant.

20

The tenth factor is the extent to which the advances were used to acquire capital assets. The undisputed testimony was that Joanne Ashenfelter's advances were not used to purchase new assets; they were used to pay down the bank debt. The Court concludes that the use of an advance to reduce a debt obligation does not equate with the acquisition of a capital asset; accordingly, this factor weighs in favor of the Defendant.

The final factor is the presence or absence of a "sinking fund" to provide repayment of the loan. The presence of a lien, however, "obviate[s] any need for a sinking fund." Autostyle Plastics, 269 F.3d at 753. Because Joanne Ashenfelter held a valid lien, this factor weighs in favor of the Defendant.

Based upon an analysis of the Roth Steel factors, the vast majority of them weigh in favor of the Defendant. Thus, were the Court to conclude that equitable recharacterization is a viable remedy in an appropriate case, the Court would not find sufficient facts here to support that conclusion.

The Court further concludes that the evidence adduced at trial concerning the Debtor's 2012 balance sheets and tax returns is not conclusive as to the question of equitable recharacterization. The evidence at trial demonstrated that the 2011 balance sheets, loan documents, and testimony unambiguously described the transaction as a loan. (Trustee Ex. C, Balance Sheet dated 12/31/2011). The applicable test for equitable subordination is whether the transaction was a capital contribution "ab initio" based upon the intention of the parties at the time. See In re Cold Harbor Associates, L.P., 204 B.R. 904, 915 (Bankr. E.D. Va. 1997); Duke & King, 508 B.R. at 158 (concluding that judgment for failure to state a claim was appropriate because the plaintiff failed to plead "a bit of circumstance contemporaneous with the []

lending-in" that suggests equity rather than a loan).  See also Airadigm Communs., Inc., 616

F.3d at 658 (equitable recharacterization determines what the transaction was "in the first

instance").  Stated another way, contemporaneity is not lacking in this case.  And contrary to the

Trustee's assertion of "fabrication" with respect to the loan, the Court concludes that the loan

was legitimate and not illegal.  Moreover, the Trustee failed to meet his burden to show any

evidence contemporaneous with the lending—to refute the testimony that the transaction was to

be a loan, and in fact was a loan.

The Court also concludes that this case is substantially similar to the claims asserted in

Duke & King.  Here, in his closing arguments, the attorney for the Trustee objected to the

transaction because Joanne Ashenfelter, in his words, had no "skin in the game."  A similar

argument was raised by the plaintiff in Duke & King, which Judge Kishel summarized:

> The sparse phrasing Kaye uses to invoke recharacterization reflects his intention
> to do just that, i.e., to have the court exercise equity in a free-flowing fashion to
> create anew or to reclassify.  His own, semi-articulated point is that he believes
> that the Kinderhook Defendants should have structured their infusions as equity
> investments, with no structured right to repayment.  His judgmental "should"
> stems from his threshold accusation, that the Kinderhook Defendants ineptly
> undercapitalized Duke and King at the outset.  So, he insists, when things then
> went badly they should have shouldered an even greater risk when they put in
> more money, by fastening that to their shareholder-equity rather than casting it as
> debt.  On the basis of his opinion alone, he would have the court conclusively
> reorder the Kinderhook entity-defendants' status in the underlying cases.

Duke & King, 508 B.R. at 158.  Judge Kishel rejected such an approach, finding it inconsistent

with both the Bankruptcy Code and the case law coming from other circuits:

> This sort of approach would be consistent with the two-pronged test of the
> Eleventh Circuit.  Under that, initial undercapitalization (obviously to be deemed
> the fault of corporate promoters) and corporate desperation at the time of the
> post-formation infusion (attributable in part to that early undercapitalization,
> blooming out to lack of creditworthiness in the open market), would justify a
> judicial shoehorning down into the lower status of equity, taking the lending

22

> shareholder out of competition with third-party creditors of the company in the priority of claims. The unspoken thought seems to be, "and that's just what they deserve."
>
> The Eleventh Circuit test is not binding precedent in this jurisdiction. In its brevity and in its arrogation of broad judicial power to adjust after the fact, it stands alone among the appellate courts that have addressed recharacterization in the context of bankruptcy. It cites no precedent for its holding. Its test seems particularly rigid—much at odds with the weighing-and-balancing essence of equity. It simply is not the rule to apply.

Id. (citations omitted). This Court agrees. A rigid approach that allows a trustee to recharacterize a transaction because the trustee believes that the corporate lender should have a "skin in the game" is not authorized by any provision of the Bankruptcy Code. Even if the Court were to adopt a theory of equitable recharacterization, it would not do so in an inflexible fashion.

Were this Court to conclude that equitable recharacterization is permitted—in conjunction with § 105(a) of the Bankruptcy Code—the Trustee has presented no conclusive evidence under the applicable law that would justify it.[7]

Therefore, Count Two of the Trustee's complaint must be dismissed.

The Court is also not persuaded by two peripheral arguments raised by the Trustee, sounding under theories of quasi-estoppel and Minnesota business law.

---

[7] The Trustee also asserted equitable recharacterization under state law, citing Schaub v. Kortgard, 372 N.W.2d 427, 430 (Minn. Ct. App. 1985) (a "shareholder's loan to the corporation may, after a consideration of all the facts and circumstances, be treated as a contribution of capital" (internal citation omitted)). The Court did not find Schaub particularly helpful, under the facts of this case. That said, for the same reasons that this Court declines to find recharacterization appropriate under Roth Steel, it would make the same conclusion under Schaub.

1.    The Doctrine of Quasi-Estoppel

The Trustee has claimed that the doctrine of quasi-estoppel bars Joanne Ashenfelter from

claiming that her advances to the company were loans rather than equity.  Quasi-estoppel

"forbids a party from accepting the *benefits* of a transaction or statute and then subsequently

taking an inconsistent position to avoid the corresponding obligations or effects."  In re

Davidson, 947 F.2d 1294, 1297 (5th Cir. 1991) (emphasis added) (quasi-estoppel precluded

debtor husband from claiming that his payment obligations to nondebtor wife were not in nature

of alimony and were accordingly dischargeable where husband had treated payments as alimony

for tax purposes and wife had detrimentally relied upon characterization of payments as alimony

and paid appropriate taxes on them in accordance with divorce settlement agreement; "Mr.

Davidson has accepted the benefits of his agreement:  He has taken tax deductions for the

payments to Mrs. Davidson. He now tries to escape the bankruptcy effects of his election to treat

the payments as alimony.").  See also In re Robb, 23 F.3d 895, 898–99 (4th Cir. 1994) (applying

Davidson; "We find this reasoning persuasive. In the present case, the Debtor 'has accepted the

benefits of his agreement [by] tak[ing] tax deductions for the payments to [his ex-wife].'").

While Davidson and Robb correctly state the doctrine of quasi-estoppel, the Court

concludes that quasi-estoppel does not apply to the facts of this case.  Joel Carlson credibly

testified that Joanne Ashenfelter received no tax benefit by her tax returns incorrectly having

described the contribution as equity rather than a loan in her tax returns.  Mr. Carlson testified

that the calculation of a taxpayer's basis in property is the same irrespective of whether its

taxable value in a company comes from a loan or from equity, and that it made no difference in

the taxes due.  The Trustee offered no evidence to the contrary and the Court has no basis to

conclude otherwise.

The Trustee alleged that Joanne Ashenfelter received some benefit, if not a tax benefit, from having her tax returns show equity rather a loan. The Trustee failed to identify any such benefits; no testimony was presented stating there was a benefit, and the Court declines to infer any–in the absence of a basis to do so.

2.     Impermissible Distribution under Minnesota Law

The Court concludes that, based on the evidence and the record made at trial, Joanne Ashenfelter holds the status of a valid, secured creditor of the Debtor;[8] as such, she was entitled to the payment she received on the loan that she gave the company. Moreover, Joanne Ashenfelter has an enforceable security interest in the $70,000.00 currently in the Trustee's possession. Because the Court has concluded that Joanne Ashenfelter was entitled to payment as a valid, secured creditor of the Debtor, the Court concludes that Joanne Ashenfelter did not receive an impermissible "distribution" under Minn. Stat. § 322B.54.

**ORDER**

In the light of the Court's findings of facts and conclusions of law, the Trustee shall take nothing from the Defendant, Joanne Ashenfelter.[9]  Accordingly,

---

[8] See BKY Case No. 14-41184 ECF No. 1 (Schedule D).

[9] At the close of the Trustee's case-in-chief, the Defendant moved for relief under Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052. The Court reserved ruling on the Defendant's motion. See Fed. R. Civ. P. 52(c) (providing, in relevant part, that "[t]he court may, however, decline to render any judgment until the close of the evidence"). The Court's findings of fact, conclusions of law, and order constitute the Court's disposition of the Defendant's motion under Rule 52.

**IT IS HEREBY ORDERED:**

1.      The Trustee's complaint against Joanne Ashenfelter is DISMISSED WITH

PREJUDICE.

2.      Both parties shall bear their own costs.

*/e/ Michael E. Ridgway*

Michael E. Ridgway
United States Bankruptcy Judge

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on *06/05/2015*
Lori Vosejpka, Clerk, by MJS

26